## IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS
## SPRINGFIELD DIVISION

| | | |
|---|---|---|
| STEPHEN NOAH DURBIN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 09-3095 |
| | ) | |
| MICHAEL ASTRUE, | ) | |
| COMMISSIONER OF | ) | |
| SOCIAL SECURITY, | ) | |
| | ) | |
| Defendant. | ) | |

## <u>OPINION</u>

JEANNE E. SCOTT, U.S. District Judge:

Plaintiff Stephen Noah Durbin appeals the Commissioner's denial of his application for disability insurance benefits under the Social Security Act. This Court has jurisdiction. 42 U.S.C. § 405(g). The parties have filed cross-motions for summary judgment. <u>Plaintiff's Motion for Summary Judgment (d/e 9)</u>; <u>Defendant Commissioner's Motion for Summary Affirmance (d/e 13)</u>. For the reasons set forth below, the Commissioner's Motion for Summary Affirmance is ALLOWED and Durbin's Motion for Summary Judgment is DENIED. The Decision of the Commissioner is AFFIRMED.

# STATEMENT OF FACTS

Durbin was born on October 3, 1964. Durbin graduated from high school. He spent over 20 years working as an agricultural chemical salesman/delivery driver. <u>Answer (d/e 7)</u>, attached <u>Certified Record of Proceedings before the Social Security Administration (hereinafter R.)</u> 76-77, 105. In 2002, Durbin was in an automobile accident in which his vehicle rolled over. He was unconscious for ten to fifteen minutes and suffered serious injuries, including broken ribs and damage to his lung. <u>R.</u> 150, 396. In 2004, Durbin started having panic attacks and seizures. The seizures are referred to in the record by various terms, including seizures, spells, fainting spells, passing out and sleep attacks. Durbin became unconscious during the seizures. On May 28, 2004, Durbin went to see a psychiatrist, Obul Reddy, M.D. <u>R.</u> 169. Dr. Reddy diagnosed Durbin as suffering from post traumatic stress disorder and depression. Durbin saw Dr. Reddy regularly thereafter. By October and November 2004, Dr. Reddy stated in his notes that Durbin was doing better on prescribed medications, but still had trouble in crowds. <u>R.</u> 167-68.

Durbin alleged that December 17, 2004, was the onset date of his disability. According to Durbin, he was having difficulty with absenteeism

and performing his duties due to his panic attacks and seizures. He testified that his job required him to drive to farms to sell products and also to apply the products. He stated that he could no longer perform the job because of his seizures or fainting spells, and because of his increased absenteeism due to his mental problems. His employer could not tolerate the problems anymore and terminated his employment. He has not worked since. <u>R.</u> 374, 391.

On January 24, 2005, Durbin went to see a neurologist, Claude J. Fortin, M.D. Durbin told Dr. Fortin that he was having "near daily" fainting spells. <u>R.</u> 230. Durbin told Dr. Fortin that his panic attacks were controlled with medication. <u>R.</u> 230. Dr. Fortin ordered a CT scan and an EEG. Both were normal. <u>R.</u> 147, 131, 231. Dr. Fortin diagnosed possible sleep apnea, obesity, post traumatic stress disorder, and recurrent syncope (i.e., fainting) due to sleep deprivation. <u>R.</u> 232.

On March 10, 2005, Durbin went to see David Kiel, M.D., for a follow-up visit for sinus congestion. Durbin reported having fainting spells about once a week. <u>R.</u> 316-18. Durbin underwent a sleep study on March 17, 2005. <u>R.</u> 144-46. The sleep study confirmed Dr. Fortin's sleep apnea diagnosis. Dr. Fortin stated in his notes that Durbin's fainting spells were

likely attributable to his sleep apnea.  R. 229.  Durbin saw Dr. Fortin again on May 2, 2005.  Durbin reported at that time that a CPAP machine helped him sleep better, but he still was having sleep attacks about twice a week. R. 226.[1]  A second EEG was performed on May 17, 2005.  The test showed no abnormalities or epileptic activity.  R. 130, 222.

Durbin saw Dr. Reddy on a regular basis in 2005.  In March and May 2005, Durbin told Dr. Reddy that he was still passing out, but was doing well socializing, going to restaurants, and doing well in crowds.  R. 166.  In June 2005, Durbin told Dr. Reddy that he had no panic attacks and had gone on several fishing trips with his children.  R. 165.  In July 2005, Durbin told Dr. Reddy that he was still having fainting spells and was not driving, but was doing better emotionally and was walking daily and exercising.  R. 165.

Durbin saw Dr. Reddy two times in September 2005.  On September 6, 2005, Durbin told Dr. Reddy that he was not motivated and not involved in activities, and Dr. Reddy changed his medication.  R. 164.  On October 4, 2005, Durbin told Dr. Reddy that his new medication made a significant

---

[1]CPAP stands for "continuous positive airway pressure."  American Medical Association, Complete Medical Encyclopedia (2003 ed.), at 1131.

difference. He felt optimistic and had no panic attacks. R. 162. Durbin stated that he still was passing out. R. 162.

At Durbin's November 1, 2005, appointment with Dr. Reddy, he stated that the medications were working well and that he felt motivated. R. 161. He still had fainting spells, which made him afraid to drive. Dr. Reddy noted that the panic attacks and phobic avoidance had not changed even on medication. Dr. Reddy's notes, however, stated that the medications were helping in that Durbin was not depressed and was "going out", "doing stuff", and "enjoying life." R. 161.

Durbin saw Dr. Reddy again on November 22, 2005. Durbin stated that his medication was helping and that he had no panic attacks. Durbin talked to Dr. Reddy about his disability application. Dr. Reddy wrote in his notes that Durbin suffered from panic attacks, phobic reactions, severe depression, severe anxiety attacks, and physical problems that were disabling for the next six to eight years, "if not permanently." R. 160.

Durbin saw Dr. Reddy twice in January 2006, and three times in March 2006. Dr. Reddy's notes from the March 27, 2006 session stated that Durbin was still passing out, but his medications were helping him feel like "doing stuff." R. 154.

On March 7, 2006, a psychologist, Dolores S. Trello, Psy.D., examined Durbin for a state agency. R. 148. Dr. Trello did not review medical records as part of her evaluation of Durbin. Dr. Trello reported that Durbin's chief complaint was his fainting spells or seizures. He told Dr. Trello that the spells were not controlled with medication. He reported to Dr. Trello that he also suffered from post traumatic stress disorder, claustrophobia, and panic attacks. He stated that the panic attacks were controlled with medication. R. 148. Dr. Trello's mental status examination found nothing remarkable. R. 150. Dr. Trello diagnosed Durbin as having panic disorder with agoraphobia and post traumatic stress disorder. Dr. Trello assessed Durbin's Global Assessment of Functioning (GAF) at 50 and noted "serious impairment in vocational and interpersonal functioning since his accident on December 17, 2004." R. 151.

On April 3, 2006, a state agency reviewer Erika Altman, Ph.D., opined that Durbin had mild limitations in activities of daily living and in maintaining social functioning, and moderate limitations in maintaining concentration, persistence, and pace. R. 180. She opined that Durbin could understand simple and detailed instructions, sustain concentration and persistence at work, interact appropriately with others, and adapt to

changes at work.  R. 186.  She further opined that Durbin could perform multi-step tasks.  R. 186.  Another reviewer affirmed her opinion.  R. 189.

On April 4, 2006, another agency reviewer, Virgilio Pilapil, M.D., opined that Durbin could lift 20 pounds occasionally and 10 pounds frequently, but could not climb ladders, ropes, or scaffolds, and could not be exposed to hazards.  R. 190-97.  Another reviewer affirmed these opinions.  R. 199.

In May 2006, Dr. Fortin diagnosed Durbin with complex seizures, obesity, sleep apnea, post traumatic stress disorder, hypogonadism, and B12 deficiency.  R. 206-07.  During this period, Dr. Fortin had Durbin undergo intracranial and neck angiograms, a brain MRI, and a video EEG.  All of the test results were normal or unremarkable.  After conducting these tests, Dr. Fortin changed his diagnosis to post traumatic stress disorder, hypogonadism, sleep apnea, and spells of an uncertain etiology.  He suspected that the spells were pseudoseizures or sleep attacks related to the sleep apnea.  R. 234.

Durbin saw Dr. Kiel in October 2006.  Durbin reported that he passed out once or twice a week.  R. 279.  In November 2006, Durbin underwent another brain MRI and head CT scan.  The results were unremarkable.  R.

285-86.  On November 24, 2006, Durbin went to the emergency room with left arm weakness and headaches.  The emergency room doctors opined that Durbin experienced a small stroke.  R. 239.

Durbin saw Dr. Reddy in January and February 2007.  Dr. Reddy noted that Durbin was getting his strength back and doing well, though Durbin still reported passing out and having a panic attack.  R. 347.  Durbin saw Dr. Reddy twice in March 2007.  Dr. Reddy stated that Durbin was doing well and had lost weight.  Dr. Reddy stated that the medications were working, but Durbin still was not driving.  R. 346.  At a May 2007, visit, Dr. Reddy stated in his notes that Durbin was doing wonderfully and was really active.  Durbin still reported seizures, but also reported that he was sleeping well and was not depressed.  R. 345.

At his July 2, 2007, appointment with Dr. Reddy, Durbin reported having "little seizures."  He also stated that his medications were working well, but he still could not handle crowds.  R. 344.  Dr. Reddy's notes from a September 17, 2007, appointment, stated that things were going well and that the medications were working.  R. 344.  On the same day, Dr. Reddy wrote a letter listing Durbin's diagnoses as severe refractory bipolar depression, post traumatic stress disorder, severe anxiety, panic attacks,

agoraphobia, mixed traits, unexplained seizures, passing out spells, hypertension, and obesity.  Dr. Reddy assessed a GAF score of 35.  He said the Durbin was totally and permanently disabled due to his conditions.  R. 328.

On October 2, 2007, Dr. Kiel agreed to write a letter addressed to To Whom it May Concern.  Dr. Kiel stated that Durbin had fainting spells and mild seizures.  He also stated that Durbin was being treated for post traumatic stress disorder.  Dr. Kiel stated in the letter that Durbin was doing quite a bit better, but was still completely and totally disabled and unable to work due to the fainting seizures.  R. 336.

Dr. Reddy's notes from Durbin's October and November 2007, appointments indicated that Durbin was doing well and that his medications were working.  Durbin had lost 30 pounds and was not depressed, though he was still passing out.  R. 343.  On November 1, 2007, Dr. Kiel saw Durbin and noted that he was doing well, losing weight, exercising daily and feeling better.  R. 335.

In November 2007, Dr. Fortin examined Durbin and diagnosed sleep apnea with sleep attacks possibly due to narcolepsy or sleep apnea.  R. 356. In December 2007, Dr. Fortin wrote an opinion letter regarding Durbin.  R.

355. The December 2007, letter does not appear to be in the record. On December 19, 2007, Durbin called Dr. Fortin's office to ask that Dr. Fortin revise the letter. Durbin told a representative in Dr. Fortin's office that the letter needed to state that Durbin was disabled and why. According to the representative, Durbin was upset. R. 354.

Dr. Fortin wrote a new letter dated January 8, 2008. Dr. Fortin stated in the new letter that he had been treating Durbin for his spells. The letter listed the diagnoses of sleep apnea and possible narcolepsy. Dr. Fortin stated that Durbin was disabled and unable to maintain gainful employment due to the spells. R. 325. The letter further stated that, for purposes of privacy compliance, Durbin had reviewed and approved the letter. R. 325.

On January 7, 2008, Dr. Reddy wrote another letter. Dr. Reddy listed Durbin's diagnoses as severe refractory depression, post traumatic stress disorder, severe anxiety, panic attacks, and agoraphobia. R. 327. He stated that Durbin experienced florid panic attacks, chest tightness, body shakes, and dizziness, rendering him completely disabled. R. 327.

In April 2008, Durbin told Dr. Reddy that he felt good and that the medication made the difference. Dr. Reddy noted that Durbin was more energetic, active, and could do things. R. 341. He had no nervousness. R.

341.  Dr. Reddy noted that Durbin was doing well at his May and June 2008 appointments.  R. 340-41.

The Administrative Law Judge (ALJ) conducted a hearing on August 8, 2008.  Durbin was present with his counsel.  Vocational expert James Lanier, Ph.D., was also present.  Durbin stated at the hearing that he was "very nervous, very nervous."  R. 371.  Durbin testified that, after the 2002 accident, he started having "seizures or pass-out" spells.  According to Durbin, the spells interfered with his ability to drive.  He was required to drive as an agricultural sales person.  Durbin also testified that he had panic attacks since the accident.  He testified that he had two or three seizures or panic attacks a week.  R. 374.

Durbin testified that he moved in with his mother after he had an accident when he passed out while cooking at his stove.  R. 377.  His son moved with him, but his daughter moved in with her mother, his ex-wife.  He testified that the daughter moved in with her mother because he would not attend her activities at school.  He avoided these types of situations because he had panic attacks in crowds.  He no longer went to church because he could not sit through the entire service without suffering from a panic attack.  R. 377-78.  Durbin also testified that he suffered from

depression.  R. 382-84.

Durbin testified that he did some housework, such as vacuuming, dishes, and laundry as long as he was having a good day.  R. 385.  He went fishing with his children two weekends a month.  R. 385.  He did not drive, and he did not cook any more.  He gave up both of these activities because of the problem of passing out.  He took care of his personal hygiene, but had some problems with his mother's shower because of his claustrophobia. To address the problem, the bathroom was remodeled to install a tub instead of a shower stall.  R. 387-88.

Dr. Lanier then testified.  The ALJ asked Dr. Lanier:

> Mr. Lanier, I want you to assume a person the same age, education and work experience as the claimant and assume this person can perform the full range of medium work, except that he should have only occasional contact with the public, coworkers and supervisors, and should be limited to simple one and two-step tasks.  He would have to avoid exposure to any unprotected hazards such as heights and machinery.  He would have no exposure to ladders, ropes or scaffolds and only occasional -- strike that.  He would have to avoid exposure to unprotected hazards such as heights and machinery.  Also, we have to avoid -- he can only have occasional contact with loud noises.  Would such a person be able to perform Mr. Durbin's prior relevant work?

R. 399-400.

Dr. Lanier opined that the hypothetical individual could not perform

Durbin's past work.  R. 400.  Dr. Lanier, however, opined that the hypothetical individual could perform several jobs, including hand packager, laundry laborer II, order caller, hand presser, surveillance system monitor, and eye glass frame polisher.  R. 400.

The ALJ then asked Dr. Lanier to assume that the person needed to avoid confined spaces.  Dr. Lanier opined that this additional limitation might eliminate the surveillance system monitor and eye glass frame polisher jobs.  R. 401.  The ALJ then asked whether employers would tolerate non-scheduled ten-minute breaks two to three times per week.  Dr. Lanier opined that, "In most instances employers are not going to tolerate that." R. 401.

Durbin's counsel then examined Dr. Lanier.  In response to counsel's questions, Dr. Lanier opined that a person in the jobs he identified would need to maintain a productivity level of 90 percent, meaning that the person needed to attend to his work at least 90 percent of the time that he was on the job.  Dr. Lanier also opined that a person in these jobs would be terminated if he missed more than two days of work per month.  Dr. Lanier did not express an opinion on whether a person could perform the jobs he listed if the person could not be in close proximity of other workers.  Dr.

Lanier stated that some of the jobs listed could be done while the person was alone, such as the hand presser, surveillance system monitor, and eye glass frame polisher.  R. 402-03.

The ALJ issued his Decision on September 4, 2008.  The ALJ followed the five-step analysis set forth in the Social Security Administration regulations (Analysis).  20 C.F.R. §§ 404.1520, 416.920.  Step 1 requires that the claimant not be currently engaged in gainful activity.  20 C.F.R. §§ 404.1520(b), 416.920(b).  If true, Step 2 requires the claimant to have a severe impairment.  20 C.F.R. §§ 404.1520(c), 416.920(c).  If true, Step 3 requires a determination of whether the claimant is so severely impaired that he is disabled regardless of his age, education, and work experience.  20 C.F.R. §§ 404.1520(d), 416.920(d).  Such severe impairments are set forth in an Appendix to the Regulations referred to as the Listings.  20 C.F.R. Part 404 Subpart P, Appendix 1.  The claimant's condition must meet the criteria in a Listing or be equal to the criteria in a Listing.  20 C.F.R. §§ 404.1520(d), 416.920(d).

If the claimant is not so severely impaired, then Step 4 requires the ALJ to determine whether the claimant is able to return to his prior work considering his residual functional capacity (RFC).  20 C.F.R. §§

404.1520(e), 416.920(e).  If the claimant cannot return to his prior work, then Step 5 requires a determination of whether the claimant is disabled considering his RFC, age, education, and past work experience.  20 C.F.R. §§ 404.1520(f), 416.920(f).  The claimant has the burden of presenting evidence and proving the issues on the first four steps.  The Commissioner has the burden on the last step; the Commissioner must show that, considering the listed factors, the claimant can perform some type of gainful employment that exists in the national economy.  Knight v. Chater, 55 F.3d 309, 313 (7th Cir. 1995).

The ALJ found that Durbin met his burden at Steps 1 and 2.  He was not working, and he suffered from significant impairments consisting of seizures, panic disorder, and post traumatic stress disorder.  R. 19.  At Step 3 of the Analysis, the ALJ found that Durbin's impairments were not severe enough to meet a Listing.  R. 20.

At Step 4, the ALJ found that Durbin had the RFC to perform medium work except that he had to avoid exposure to unprotected hazards, he was limited to jobs involving simple, one or two-step tasks, and he had to have only occasional contact with the public, co-workers, and supervisors. R. 20.  The ALJ found that with this RFC Durbin could not perform his

prior work.  R. 23.

In determining Durbin's RFC, the ALJ relied primarily on the opinions of the state agency evaluators and Durbin's testimony regarding his daily activities.  R. 20-22.  The ALJ determined that Durbin's statements regarding the severity of his conditions were not credible.  R. 21-22.  The ALJ found that Dr. Reddy's formal opinions regarding Durbin's mental impairments were not supported by his own progress notes or elsewhere in the record.  R. 22.  The ALJ noted that Durbin told Dr. Trello that his panic attacks were controlled by medications and, also, that Dr. Trello's mental status examination was normal.  R. 22.

The ALJ found that the record failed to establish that Durbin's fainting spells or seizures were severe enough to prevent all work activity. The ALJ noted that the results of all of the medical tests (such as EEGs, CT scans, and MRIs) were normal, and that Dr. Fortin's neurological examinations were normal.  According to the ALJ, the only evidence of spells or seizures in Dr. Fortin's notes were Durbin's "subjective allegations of seizures anywhere from once per week to two or three times per week, but without any objective verification."  R. 21 (citations to the record omitted). The ALJ further noted that Durbin only went to the hospital once for

seizures in November 2006, and the tests performed at the time were normal.  R. 21.

The ALJ also discounted the opinions of Durbin's treating physicians, Drs. Reddy, Kiel, and Fortin.  The ALJ stated that these opinions were not entitled to controlling weight because the opinions were not supported by objective findings.  R. 22.

At Steps 5, the ALJ found that Durbin could perform a significant numbers of jobs in the national economy.  The ALJ relied on the testimony of Dr. Lanier to make this finding.  R. 24.  The ALJ found that Dr. Lanier's testimony was consistent with the information contained in the Department of Labor's Dictionary of Occupational Titles (DOT).  R. 24.

Durbin appealed to the Appeals Council.  The Appeals Council denied his request for review on February 13, 2009.  R. 4.  Durbin then filed this action for judicial review.

## ANALYSIS

This Court reviews the ALJ's Decision to determine whether it is supported by substantial evidence.  Substantial evidence is, "such relevant evidence as a reasonable mind might accept as adequate" to support the decision.  Richardson v. Perales, 402 U.S. 389, 401 (1971).  This Court

must accept the ALJ's findings if they are supported by substantial evidence and may not substitute its judgment for that of the ALJ.  Delgado v. Bowen, 782 F.2d 79, 82 (7th Cir. 1986).  The ALJ further must articulate at least minimally his analysis of all relevant evidence.  Herron v. Shalala, 19 F.3d 329, 333 (7th Cir. 1994).  The Court must be able to "track" the analysis to determine whether the ALJ considered all the important evidence.  Diaz v. Chater, 55 F.3d 300, 308 (7th Cir. 1995).

In this case, the Decision of the ALJ was supported by substantial evidence.  The ALJ's determination at Step 3 and his determination of Durbin's RFC were supported by the opinions of the state agency evaluators and the results of all of the medical scans and tests that were normal or unremarkable.  The repeated positive comments in Dr. Reddy's notes also supported the ALJ's determinations that Durbin's mental impairments were not as severe as Durbin and Dr. Reddy otherwise claimed.  The sleep study established that Durbin suffered from sleep apnea, but did not provide any evidence regarding either: (1) a connection between the sleep apnea and Durbin's seizures; or (2) the severity of Durbin's seizures.  The record also indicated that Durbin's use of a CPAP machine improved his sleeping.  The only evidence regarding the severity of Durbin's fainting spells or seizures

was Durbin's subjective reports. The ALJ determined that Durbin was not fully credible regarding the severity of his fainting spells. The Court will not disturb that credibility finding. The ALJ's conclusion that the spells did not preclude Durbin from working, thus, was supported by substantial evidence. Finally, Dr. Lanier's opinions supported the determination at Step 5 that Durbin could perform a substantial number of jobs in the national economy.

Durbin argues that the ALJ's Decision was not supported by substantial evidence because Dr. Lanier's opinions were inconsistent with the information in the DOT. When a conflict exists between the DOT and the opinions of a vocational expert, the ALJ must develop a record to explain and resolve the conflict. SSR 00-4p. The vocational expert's opinions must also be consistent with the definitions in the DOT, such as the definitions for sedentary, light, medium, or heavy work, or unskilled or skilled work. Id.

Durbin argues that Dr. Lanier's opinion conflicted with the DOT because: (1) the ALJ determined that Durbin had the RFC to perform simple, one or two-step tasks; but (2) the jobs listed by Dr. Lanier involved more than simple one or two-step tasks because the DOT stated that the jobs required either a specific vocational preparation (SVP) of 2, or because

they required a reasoning level (R) of 2 or more. An SVP of 2 means that the job requires something beyond a short demonstration to learn, and may require up to a month to learn. DOT, Appendix C (Appendix C), available at www.oalj.dol.gov/PUBLIC/DOT/REFERENCES/DOTAPPC.HTM, visited January 6, 2010. An R2 reasoning level means that the job requires the ability to apply a common sense understanding to carry out detailed but uninvolved written or oral instructions, and to deal with problems with a few concrete variables in or from standardized situations. Appendix C. Durbin argues that a job with an SVP of 2 or an R2 reasoning level in the DOT means that the job involves more than simple one or two-step tasks. Thus, he argues, Dr. Lanier's opinions conflicted with the DOT, and the ALJ was required under SSR 00-4p to resolve the conflict on the record.

Dr. Lanier's opinion that Durbin could perform jobs that have an SVP of 2 did not conflict with the ALJ's RFC determination that Durbin is limited to simple, one or two-step tasks. A job with an SVP of 2 is unskilled. SSR 00-4p. A person learning a new unskilled job may need more than a short demonstration even when the job involves simple, one or two-step tasks. Thus, no conflict existed between Dr. Lanier's opinions and the DOT due to the SVP requirements of the jobs listed by Dr. Lanier.

Dr. Lanier's opinions that Durbin could perform jobs with an R2 reasoning level, however, may have created a conflict. According to the DOT, an R1 reasoning level requires the ability to carry out simple one or two-step instructions, and to deal with standardized situations with occasional or no variables in or from these situations encountered on the job. Appendix C. Jobs with an R1 reasoning level, therefore, are consistent with the ALJ's determination that Durbin was limited to simple, one or two-step tasks. Dr. Lanier's opinion that Durbin could have performed work requiring a reasoning level of R2 may have created a conflict that the ALJ should have resolved on the record.

The error, however, was harmless because at least one of the jobs listed by Dr. Lanier had an R1 reasoning level under the DOT. The laundry laborer position, DOT 361.687-018, had an SVP of 2, but an R1 reasoning level. DOT § 361.687-018, available at www.oalj.dol.gov/PUBLIC/DOT/REFERENCES/DOT03A.HTM, visited on January 6, 2010. Dr. Lanier's opinion, at least with respect to the laundry laborer job, did not conflict with the DOT.

Dr. Lanier also opined that 13,000 laundry laborer jobs existed. This number is more than sufficient to meet the Commissioner's burden at Step

5 to show that Durbin could perform a substantial number of jobs available in the national economy. Liskowitz v. Astrue, 559 F.3d 736, 743 (7th Cir. 2009). Any error in the ALJ's failure to resolve any possible conflicts between Dr. Lanier's opinions and the DOT with respect to other jobs was harmless.

Durbin also argues that the ALJ erred in evaluating Durbin's activities of daily living. The ALJ determined that Durbin's activities of daily living and his social functioning were mildly impaired. Durbin argues that Durbin had serious limitations in these areas because he was unable to leave home because of his fear of crowds and the possibility of panic attacks. Durbin relies on his own testimony at the hearing and his subjective reports to his physicians. The ALJ determined that Durbin was not fully credible as to the severity of his impairments, and the Court sees no basis to overturn this credibility determination. Furthermore, other evidence in the record supported the ALJ's determination regarding Durbin's activities of daily living. Dr. Reddy's progress notes regularly indicated that Durbin was doing well and getting out of his house and going into public places. The agency evaluator Dr. Altman opined that Durbin had mild limitations on his activities of daily living and social functioning. A second evaluator

concurred with Dr. Altman's opinion. This ALJ's determination, thus, was supported by substantial evidence.

Durbin last argues that the ALJ failed to give proper consideration to the medical opinions presented by Durbin. Durbin argues that the ALJ should have given controlling weight to the opinions of treating physicians Drs. Reddy and Fortin. The ALJ determined that Drs. Reddy and Fortin's opinions were not supported by other medical evidence in the record. This decision was supported by substantial evidence. A treating physician's medical opinion is entitled to controlling weight when it is well supported by medically acceptable clinical and diagnostic techniques and is reasonably consistent with the other substantial evidence in the record. 20 C.F.R. § 404.1527(d)(2); SSR 96-2p. Dr. Reddy's conclusory opinions were not consistent with the more optimistic descriptions of Durbin's condition in his treatment notes. Dr. Fortin's opinions, regarding the frequency and severity of Durbin's seizures or fainting spells, were based on Durbin's subjective reports. The sleep study confirmed that Durbin had sleep apnea. The sleep study, however, was not intended to evaluate the severity of Durbin's seizures. All of the other diagnostic tests were normal or unremarkable. The ALJ found that Durbin was not credible in his description of the

severity of his impairments. The Court will not disturb that determination. Given Durbin's lack of credibility, the ALJ found that Dr. Fortin's opinions were not entitled to controlling weight. This determination was supported by substantial evidence.

Based on the record, the Court must conclude that the ALJ's Decision was supported by substantial evidence. The Decision is, therefore, affirmed.

THEREFORE, Defendant Commissioner's Motion for Summary Affirmance (d/e 13) is ALLOWED, and Plaintiff's Motion for Summary Judgment (d/e 9) is DENIED. The decision of the Commissioner is affirmed. All pending motions are denied as moot. This case is closed.

IT IS THEREFORE SO ORDERED.

ENTER: January 15, 2010

FOR THE COURT:

s/ Jeanne E. Scott
JEANNE E. SCOTT
UNITED STATES DISTRICT JUDGE